## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **STAR TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CSIR ENTERPRISES, INC.,** | ) | |
| **CERTAIN UNDERWRITERS AT LLOYDS,** | ) | |
| **AND INSURER'S UNLIMITED, INC.,** | ) | |
| | ) | **Case No. 3:04-0426** |
| **Defendants.** | ) | |
| ------------------------------------------------------------- | | **JUDGE TRAUGER** |
| **INSURER'S UNLIMITED, INC.,** | ) | |
| | ) | |
| **Third-Party Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **INSURANCE NETWORK SERVICES.COM,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Third-Party Defendant** | ) | |

### MEMORANDUM

Pending before the court is defendant Insurer's Unlimited, Inc.'s ("I.U.") Motion for Summary Judgment Against Plaintiff Star Transportation, Inc. ("Star") (Docket No. 50), to which Star has responded (Docket No. 69), and I.U.'s Motion for Summary Judgment Against Third-Party Defendant, Insurance Network Services.Com, Inc. ("INS.COM") (Docket No. 53), to which INS.COM has responded and filed a Cross-Motion for Summary Judgment (Docket No. 66), to which I.U. has responded (Docket No. 71). Also before the court is the Motion for

Summary Judgment filed by defendant Certain Underwriters at Lloyds[1] ("Underwriters") (Docket No. 62), to which Star has responded (Docket No. 81), and Underwriters has replied (Docket No. 82).

For the reasons expressed herein, the Motions for Summary Judgment filed by defendant I.U. and defendant Underwriters will be granted as to plaintiff's claims for apparent agency, ratification and adoption, and negligent misrepresentation. Summary judgment will be denied, however, as to plaintiff's negligence claim, as well as its claim based on the doctrine of equitable estoppel. In addition, INS.COM's Motion for Summary Judgment as to I.U.'s Third-party Claim will be granted, and I.U.'s Motion for Summary Judgment will be denied as moot.

## I. FACTS and PROCEDURAL HISTORY[2]

This case, involving one motor carrier and four insurance entities, arises from the September 23, 2002 loss of 69 Dell laptop computers worth approximately $127,000.00. Prior to the loss, plaintiff Star, a federally licensed motor carrier domiciled in Nashville, Tennessee, purchased a fraudulent cargo insurance policy through defendant CSIR Enterprises, Inc., a New York corporation operating as an insurance agency. Although Star believed that it had

---

[1] The defendant identified by plaintiff as Certain Underwriters at Lloyds advises that their appropriate and full designation is "Those Certain Underwriters at Lloyd's Who Subscribe to Certificate No. MTC 10069," not "Underwriters at Lloyds." According to this defendant, the participating Underwriter is a syndicate called BRIT Insurance Holdings PLC, for which Anthony Sigwart is the Cargo Underwriter. For ease of reference, however, the court will refer to this entity simply as "Underwriters."

[2] Unless otherwise noted, the facts have been drawn from Plaintiff Star's Response to Defendant Underwriters Statement of Material Facts (Docket No. 80), Plaintiff Star's Corrected Response to I.U.'s Statement of Material Facts (Docket No. 78), Response of Defendant Underwriters to Plaintiff Star's Statement of Contested Facts (Docket No. 83), and Response of I.U. to Plaintiff Star's Statement of Contested Facts (Docket No. 72).

2

purchased a policy covering all 500 of the trucks it operated, including the truck carrying the September 23, 2002 Dell load, such was not the case, as CSIR had perpetrated an insurance scam on Star and defrauded it. The facts surrounding Star's purchase of a fraudulent insurance policy, which are undisputed for purposes of the pending motions, are as follows.[3]

In the fall of 2001, after receiving notice from Star's then current insurer that, beginning November 13, 2001, rates would increase by approximately 38 percent, Ronnie Holland, the Director of Risk Management at Star who was responsible for obtaining insurance to cover Star's operations, initiated the process of soliciting proposals from insurance agents. The primary goal of Holland in soliciting insurance proposals from various insurance agents was to obtain competitive pricing for the insurance needed by Star. Prior to receiving a proposal from CSIR, Holland received proposals from other agents. However, all of the proposals included a substantial premium increase over the previous year.

The existence of CSIR was then made known to Holland through Tom Kelly, a Vice President at Star. Kelly became aware of CSIR through Joel Amerling, an individual from New York who worked in finance assisting companies to purchase trucks.[4] Amerling advised Kelly that CSIR, an insurance agency in New York, had the ability to get insurance through Underwriters. Amerling, however, had no connection to Underwriters.

Thereafter, a meeting between a representative of CSIR, Frank DePrisco, and

---

[3]CSIR is not a party to the motions currently before the court and has not agreed to any of the following facts as undisputed.

[4]Coincidentally, Kelly and Amerling are parties to a separate, unrelated suit currently before this court. *Kelly v. Intl Capital Resources, Inc. & Joel Amerling*, Case No. 3:05-cv-00230.

3

representatives of Star, including Holland, took place at Star's offices in Nashville. According to Holland, DePrisco stated that CSIR was a "Managing General Agent" for Underwriters and had "power of the pen" to act on behalf of Underwriters in placing insurance. On behalf of Star, Holland completed and signed an application for insurance containing information about Star's company, including the number of vehicles it operated, and provided it to CSIR. (Docket No. 80, Attach. 2, Affidavit of Ronnie Holland ¶ 5)

CSIR, through DePrisco, made a proposal to Star to place Star's insurance with Underwriters. The proposal for insurance from CSIR was significantly cheaper than the proposals that Star had received from other insurance agencies. In fact, the proposal received from CSIR was $484,000 less than the last proposal from their then-current insurer. Star did not ask CSIR to confirm in writing the representations that were made by CSIR regarding its authority to act on behalf of Underwriters, nor did Star request confirmation from anyone other than CSIR that CSIR had such authority.

On November 12, 2001, Holland informed CSIR that Star accepted its proposal and would purchase umbrella and cargo liability insurance through CISR. The agreed-upon premium was to be $610,000 and, on November 16, 2001, Star paid CSIR a down-payment of $183,000 for the insurance policies. Thereafter, Star made seven scheduled monthly payments of $61,000, for a total of $610,000 in premium costs. (Docket No. 67–4, Holland Depos pp. 38–40) Also after Star's acceptance of the proposal submitted by CSIR, CSIR faxed Star an insurance binder form showing a motor truck cargo policy issued by Underwriters and an umbrella insurance policy issued by Underwriters. The policies themselves were not actually provided to Star at this time. (Holland Aff. ¶ 7)

4

In January of 2002, Star was advised by the Federal Motor Carrier Safety Administration (FMCSA) that certain mandatory filings had not been made by Underwriters. *Id.* ¶ 8. According to Holland, because these filings "are cargo endorsements which are mandatory in order to retain our authority," Star immediately contacted CSIR to resolve the issue.[5] *Id.*

Also in January of 2002, CSIR contacted INS.COM, an insurance wholesaler primarily engaged on behalf of retail agents seeking coverage for their customers, and inquired as to the type of insurance INS.COM might have available to offer CSIR.[6] DePrisco and another representative from CSIR went to Mississippi to meet with INS.COM, and CSIR subsequently forwarded an application for motor truck cargo insurance to INS.COM on behalf of Star. However, the application, which was dated February 6, 2002, was not the one previously completed by Holland and signed on behalf of Star. The application forwarded by CSIR to INS.COM stated that Star was seeking coverage for only ten tractor units, all of which were identified in an attached schedule, as opposed to all 500 units as originally requested by Star to CSIR. According to Holland, the application submitted by CSIR to INS.COM was not completed by anyone at Star. The application provided by CSIR to INS.COM did not bear the signature of any actual representative from Star, and the person who signed this application is unknown to Star.

_____

[5]Holland understood that the filing of proof of cargo coverage with the FMCSA was for the purpose of providing notice to the Department of Transportation, shippers, and carriers that Star carried at least $10,000 of cargo coverage, as required by federal law. According to Holland, these filings are a prerequisite for continuing operations as a motor common carrier and signify that cargo insurance has been obtained through a cargo insurer admitted with the FMCSA. (Holland Aff. ¶ 9)

[6]It is undisputed that INS.COM held no binding authority on behalf of any insurance company.

5

INS.COM then forwarded the application provided by CSIR on behalf of Star, seeking coverage for only ten Star trucks, to I.U. and requested that I.U. issue a policy for the requested coverage.[7]  Defendant I.U., in turn, transmitted a policy to INS.COM on behalf of defendant Underwriters, providing coverage for the ten trucks identified in the application.[8]

In addition, immediately after the Star application was received by I.U. (on or about February 6, 2002), I.U. requested attorneys for Underwriter to file certain documents with the FMCSA on behalf of Star and in connection with the policy of insurance it issued to Star on Underwriters' behalf.  I.U. did so based on notes in the application margin that stated "Company needs filing in Washington quickly."[9]  Because I.U. believed that the application received from INS.COM was for the complete fleet of Star, which it believed had only ten units, it requested that the FMCSA filings reflect the issuance of a cargo insurance policy by Underwriters covering "all vehicles, owned, operated or leased by the insured."  I.U. did not check the FMCSA website to confirm Star's size or status until seven months later, when it was informed by Underwriters'

---

[7]I.U. and INS.COM had previously executed a Brokerage Agreement in February of 2001, by which I.U. and INS.COM agreed that INS.COM could submit to I.U. as "agent of the insured" certain insurance business.  Pursuant to this arrangement with INS.COM, Underwriters's policies would be made available to retail agents working with INS.COM, and I.U. understood that INS.COM, as well as the retail agents, would make a commission out of the premiums charged to the insured.  (Docket No. 80–3, Culley Depos. pp. 18–19)  I.U. also understood that, pursuant to this agreement, INS.COM would act as an intermediary between retail agents and I.U./Underwriters.  However, I.U. did not establish any procedures for qualifying agents.  *Id.* pp. 43–44)

[8]Underwriters agrees, for purposes of summary judgment, that, pursuant to a limited binding authority agreement between I.U. and Underwriters, I.U. was given the authority to quote rates and issue cargo policies for carriers operating up to 10 units, without prior approval from Underwriters.

[9]I.U. understood the need for the FMCSA filings, as well as their significance.

6

Security that the website existed.[10]

After the February 6, 2002 FMCSA posting, Star made the five remaining monthly premium payments of $61,000, out of the required seven, to CSIR.  By May of 2002, Star had completed the required payments.[11]

After INS.COM received the insurance policy transmitted by I.U., it forwarded that insurance policy, along with an additional copy, to CSIR.  It was not until early June of 2002, however, that CSIR sent Star the umbrella policy and the motor truck cargo policy allegedly issued by I.U. on behalf of Underwriters.[12]  Yet, the policies provided by CSIR to Star were not the policies actually issued to Star by I.U. on behalf of Underwriters.

Upon receipt of the policies forwarded by CSIR, Star contacted CSIR and complained that the policies did not provide the coverage that had been negotiated– specifically, that an exclusion for electronics not be included in the cargo policy.  CSIR thereafter issued an endorsement to address the issues raised by Star.  However, the endorsement provided by CSIR to Star was not actually issued by I.U. or Underwriters.

---

[10]Neither I.U. nor Underwriters did anything to corroborate the information regarding Star's carrier size contained in the application submitted to I.U. on Star's behalf when it was received.  I.U. was unaware of either the federal website or the Central Analysis Bureau, both of which make regulated motor carrier information available to the insurance industry.  Although Underwriters' auditor knew of the existence of the FMCSA website to verify carrier size, Underwriters did not require verification of carrier size as an underwriting guideline. Underwriters did understand that, when filings are made with the FMCSA, they apply "for all the vehicles that the carrier is operating" and that it is not possible to make filings for just some of the vehicles operated by the carrier.

[11]Star made two additional overpayments in June and July, 2002, which CSIR refunded. (Docket 67–4, Holland Depos. pp. 38–40)

[12]These policies contained the name of I.U., which was the first Star had heard of this insurance agency.  It is undisputed that no authorized representative of I.U. had any dealings with representatives of either CSIR or Star prior to Star's purchase of insurance from CSIR.

7

It is undisputed that, at least by early September of 2002, I.U. had learned through an auditor at Underwriters that there existed multiple policies issued by CSIR with I.U.'s name on them for excess policies and hundreds of thousands of premiums. On September 2, 2002, Underwriters first became aware of the discrepancies involving Star. On September 9, 2002, Underwriters issued a Notice of Cancellation through I.U. for the cargo policy that Underwriters had issued to Star.[13] The Notice of Cancellation was based on the fact that Star's operation had in excess of 400 trucks, as opposed to only ten, as identified in the application received by I.U. on behalf of Star.[14] However, the Notice of Cancellation itself did not state the reason for the cancellation and provided that coverage continued until October 7, 2002. Holland, however, immediately began his search for new insurance coverage. (Holland Aff. ¶ 18)

On September 16, 2002, as part of Holland's efforts to determine Star's coverage status with Underwriters, he contacted I.U. and spoke with representative Jim Culley. *Id.* ¶ 19. Culley informed Holland that no umbrella policy had been written by Underwriters and that the cargo policy had been written based upon submission of an application which showed Star operated only ten units. *Id.* However, he did not explicitly discuss the consequences of this fact and, according to Holland, Culley did not advise that Underwriters would not provide coverage for any cargo loss occurring before the cancellation date. *Id.* ¶ 20. Holland claims that, as a result

---

[13]I.U. issued the cancellation notice after Underwriters received information revealing that the documents Star received were completely different from the ones I.U. actually wrote. The Notice of Cancellation was the first document that traveled directly from I.U., on behalf of Underwriters, to Star.

[14]I.U. also issued a Notice of Cancellation for the erroneous information provided in the FMCSA filings, correcting such to specify that the policy covered only the ten trucks that were specifically enumerated in the application provided to I.U.

8

of his discussion with Culley and his receipt of the 30-day cancellation notice, he believed that Star had until October 7, 2002 to replace its cargo insurance and, until that date, maintained full coverage from Underwriters.

On September 17, 2002, CSIR faxed Star a letter advising that "information had just come to [CSIR's] attention which suggests that these coverages were never actually placed" and urging Star to obtain replacement coverage. On September 18, 2002, Holland faxed CSIR a letter stating, among other things, "So that Star Transportation can evaluate what insurance coverage it currently has, if any,...." (Docket No. 78 ¶ 35)

On or about September 23, 2002, Star suffered a cargo loss of 69 Dell laptop computers as a result of theft. On November 22, 2002, Star's shipper filed a loss and damage claim with Star for the loss of the 69 computers, or $127,705.05. In turn, Star filed a proof of loss and damage claim with Underwriters. Underwriters denied the claim, finding that the loss was not covered because, among other things, the vehicle from which the computers were stolen was not listed among the ten vehicles specifically insured on the policy and because the loss involved electronics, which were excluded from coverage under the policy.[15] After the denial by Underwriters, Star paid its shipper $127,705.05 for the loss of the computers. Since this time, three principals of CSIR have pled guilty to insurance fraud and have been ordered to pay restitution for the claim made by Star.

On May 13, 2004, Star filed a Complaint in this court against CSIR, Underwriters, and

---

[15]Star agrees that the truck from which the Dell computers were stolen was not one of the ten trucks identified in the fraudulent application for insurance provided by CSIR or the resulting policy issued by I.U., and that the Dell computers that were stolen from the Star truck fall within the definition of "electronics" contained in the policy of insurance that was transmitted from I.U. to INS.COM on behalf of Underwriters.

9

I.U., asserting claims of fraud and misrepresentation against defendant CSIR and claims of

apparent agency, ratification and adoption, negligent misrepresentation, estoppel, and negligence

against defendants Underwriters and I.U., seeking judgment in the amount of the premiums paid

by Star for the fraudulent insurance policy plus the value of the cargo claim. (Docket No. 1)

Thereafter, defendant I.U. filed a Third-party Complaint against INS.COM (Docket No. 14), and

defendant Underwriters filed a Cross-claim against defendant CSIR (Docket No. 17).

## II. <u>ANALYSIS</u>

### A. Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving

party must meet the burden of proving the absence of a genuine issue of material fact as to an

essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the

factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving

party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986);

*McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not

to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether

there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551

(6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

10

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

Defendants Underwriters and I.U. have moved for summary judgment as to all claims asserted against them by plaintiff Star, and I.U. and third-party defendant INS.COM have additionally moved for summary judgment on I.U.'s claim against INS.COM for indemnification. The court will now examine each of these claims in turn.

**B.     Apparent Agency or Authority**

With respect to Star's apparent agency claim, Underwriters first maintains that it cannot be held liable for the fraudulent acts of CSIR because CSIR is not an agent of Underwriters. In

determining the existence of an agency relationship, a court should examine the conduct of, and relationship between, the involved parties. *Harben v. Hutton*, 739 S.W.2d 602, 606 (Tenn Ct. App. 1987). In Tennessee, an agency relationship does not require an explicit contract or agreement between the parties.[16] *Id*.; *see also Warren v. Estate of Kirk*, 954 S.W.2d 722, 725 (Tenn. 1997). Indeed, "if the facts establish the existence of an agency relationship, it will be found to exist whether the parties intended to create one or not."

A key factor in the examination of agency is whether the principal exercised control over the agent. *White v. Revco Disc. Drug Ctrs*., 33 S.W.3d 713, 723 (Tenn. 2000). Additional factors to consider in evaluating the existence of an agency relationship include the following: (1) the source of the alleged agent's compensation; (2) the party who first set the alleged agent in motion; and (3) the party whose interests the agent is working to advance. *Harben*, 739 S.W.2d at 607. Plaintiff does not, however, assert the presence of any of these common law factors in urging the court to find the existence of an agency relationship between Underwriters and CSIR. Rather, Star maintains that applicable Tennessee law at the time of the loss mandates that CSIR be regarded as an agent of Underwriters.

> Section 56-6-147 of the Tennessee Code provides that:
>
> Every insurance agent... who solicits or negotiates an application for insurance of any kind shall, in any controversy arising from the application for insurance or any policy issued in connection therewith between the insured and insured's beneficiary and the insurer, be regarded as the agent of the insurer and not the insured or insured's beneficiary. This provision shall not affect the apparent authority of an agent.

Tenn. Code Ann. § 56-16-147, 1998 Tenn. Pub. Acts c. 1019, §17 (repealed 2002, eff. Jan. 1,

---

[16]The parties agree that Tennessee law applies to this claim.

2003).  In deciding to whom this statute applies to confer agency, the Tennessee Court of Appeals has held that § 56-6-147 must be read in conjunction with § 56-6-132(4), which defines "insurance agent" as "an individual who had an agency contract or agreement with an insurer to solicit or negotiate a policy of insurance on the insurer's behalf."  *Ebbtide Corp. v. Travelers Insur. Co.*, No. M1999-01932, 2001 LEXIS 558, at *17 (Tenn. Ct. App. July 31, 2001); *see also Alverson v. American Nat'l Insur. Co*., No. 00-6432, 2002 U.S. App. LEXIS 3132, at *496 (6th Cir. Feb. 25, 2002).

In *Ebbtide*, the Tennessee Court of Appeals examined whether § 56-6-147 applied to make defendant Willis Corroon an agent of defendant insurer, rather than plaintiff insured, for the purpose of determining whether the insurer had fulfilled its contract with the insured by communicating pertinent information solely to Corroon, rather than directly to plaintiff.  After charting the "changes in and progression of" the Tennessee agency statute since its enactment, the Court held that the substantive § 56-6-147 and the definitional § 56-6-132 must be read together and, as a result, "agency is imposed when the matter involves 'an individual who has an agency contract or agreement with an insurer to solicit or negotiate a policy of insurance on the insurer's behalf' and 'who solicits or negotiates an application for insurance of any kind.'" *Ebbtide*, 2001 LEXIS 558 at *17 (quoting § 56-6-132(4), § 56-6-147).  Because the record was "devoid of any evidence of a contract or agreement of any kind between Willis Corroon and [insurer]," the Court concluded that § 56-6-147 did not apply.

Here, as in *Ebbtide*, the controlling factor is whether there is any evidence in the record that CSIR had an agency contract or agreement with Underwriters to solicit or negotiate a policy of insurance on behalf of Underwriters.  In addition to the absence of any such contract or

13

agreement between CSIR and Underwriters, Star concedes that neither Underwriters nor I.U. had heard of CSIR prior to September of 2002, approximately four months after the last premium payment was made by Star to CSIR. (Docket No. 80 ¶ 49) Under these facts, no reasonable trier of fact could conclude that CSIR had an agency contract or agreement with Underwriters to solicit or negotiate a policy of insurance on Underwriter's behalf, and, as a result, Section 56-6-147 does not compel a finding of an agency relationship between CSIR and Underwriters.[17]

Star argues next that, despite the fact that Underwriters did not contract to confer upon CSIR the authority to act on its behalf, both Underwriters and I.U. should be held accountable for CSIR's acts based on the theory of "apparent authority."[18] To make a showing of apparent authority, the Tennessee Court of Appeals has held that it must generally be shown that: "(1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agency possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment." *Danny L. Davis Contractors, Inc. v. Hobbs*, 157 S.W.3d 414, 421–22 (Tenn. Ct. App. 2004) (quoting *Mechs. Laundry Serv. v. Auto Glass Co*., 98 S.W.3d 151, 157 (Tenn. Ct.

---

[17]While Culley, a representative of I.U., admits that the marketing scheme I.U. entered into with INS.COM was predicated on the participation of unidentified retail agents with whom INS.COM would split its commissions, this evidence, as a matter of law, does not establish the existence of an actual agency contract or agreement between Underwriters and CSIR.

[18]According to defendants, because Star has failed to establish an agency relationship between CSIR and Underwriters, its theory of apparent agency automatically must fail. In support of this proposition, defendants cite only the unpublished, per curiam Sixth Circuit opinion in *Alverson v. American Nat'l Insur. Co*., No. 00-6432, 2002 U.S. App. LEXIS 3132, at *496 (6th Cir. Feb. 25, 2002), which stated that the "fatal weakness" in plaintiff's claim of apparent authority was his failure to first establish an agency relationship between the alleged agent and alleged principal. This statement in the opinion is unsupported by citation to any authority and is inconsistent with Tennessee law.

14

App. 2002) (citations and quotations omitted)). Additionally, it is well-established in Tennessee that apparent authority must be based on the acts of the principal rather than those of the agent. *Franklin Distrib. Co., Inc. v. Crush Int'l Inc.*, 726 S.W.2d 926, 930–31 (Tenn. 1986). "Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency." *Davis.* 157 S.W.3d at 421. "[A] principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Alverson*, 2002 U.S. App. LEXIS at *496 (quoting *Southern Ry. Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675, 677 (1917)).

Thus, the fact that CSIR held itself out to Star as "Managing General Agent" for Underwriters with the "power of the pen" to act on its behalf does nothing to establish the existence of apparent authority. Also, Star does not contend that Underwriters and I.U. made actual representations to Star regarding the authority of CSIR. In fact, all of Star's representatives involved in the purchase of the insurance policies testified that they were not aware of anyone from either Underwriters or I.U. who made representations concerning the authority of CSIR to act on Underwriters' behalf. (Docket No. 80 ¶¶ 12, 13) Instead, Star argues that the defendants conferred apparent authority upon CSIR by issuing an insurance policy to Star and by posting evidence of the existence of that policy on the FMCSA website on February 6, 2002, upon which Star relied to its detriment by making additional premium payments to CSIR in connection with the policy.

Yet, "for the doctrine of apparent authority to be applicable, it is necessary that the

15

plaintiff be "aware of the principal's acts from which the apparent authority is deduced, and that he dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence." *Pickle*, 197 S.W. at 677 (quoting 2 Corpus Juris, 575). Here, Star accepted CSIR's proposal and agreed to obtain the insurance in question through them in November of 2001- three months prior to the first act, which took place February 6, 2002, that allegedly conferred apparent authority upon CSIR to act on Underwriters' behalf. At the time that Star accepted CSIR's proposal and agreed upon the amount and schedule of the premium payments, it is undisputed that neither Underwriters nor I.U. had made any representations to Star concerning the authority of CSIR to act on Underwriters' behalf. Star simply took CSIR at its word and, despite the absence of any act traceable to either Underwriters or I.U. that could be said to cloak CSIR with apparent authority, made to CSIR a down payment of $183,000 for the policy and two scheduled monthly premium payments of $61,000.

While the February 6, 2002 posting later confirmed that some insurance was procured through Underwriters, it said nothing of CSIR's general relationship to Underwriters or its authority to write insurance on its behalf. The posting served the limited purpose of confirming that the minimum level of insurance, as required by federal law, had been obtained and did not disclose the specific terms and exclusions of the policy issued by Underwriters such that Star could reasonably rely upon it as confirmation that CSIR had obtained the insurance requested by Star. In fact, it was not until June of 2002 that Star received the policy of insurance that purportedly came directly from Underwriters– but later deemed to be fraudulent– at which point,

16

all required monthly premium payments to CSIR had already been made by Star.[19]  At this time, it came to Star's attention that the contents of the Underwriters policy did not correspond to the representations previously made by CSIR to Star, allegedly on Underwriters' behalf.  Yet, Star continued to deal with CSIR in resolving the discrepancies in the insurance policy, blindly relying on CSIR's representation that the subsequent endorsements provided by CSIR had been written under the authority of Underwriters.  Under these facts, no reasonable trier of fact could conclude that Star was aware of any acts from which apparent authority could be deduced at the time that it agreed to deal with CSIR as Underwriters' agent in the purchasing of insurance coverage or that Star, after the February 6, 2002 posting, and again in June of 2002, relied on the posting as evidence of CSIR's authority to act on behalf of Underwriters in the exercise of reasonable prudence.

### C.      Ratification

In its Complaint, Star alleges also that the insurance policy actually transmitted to Star should govern because both Underwriters and I.U. "ratified and adopted the representations of CSIR with respect to coverage by accepting premium proceeds and issuing endorsements and policies to Star which were tendered to CSIR for delivery to Star."  (Docket No. 1 ¶ 52)  In Tennessee, "[r]atification of a contract occurs when one either approves, adopts, or confirms a contract previously executed by another[,] in his stead and for his benefit, but without his

---

[19] In light of Star's admission that it did not learn of I.U.'s existence until June of 2002 (Docket No. 78 ¶ 41), after Star had completed payment to CSIR for the insurance coverage at issue, Star's theory of apparent agency is particularly untenable with respect to defendant I.U. Star has failed to allege any act by I.U., of which Star had knowledge and dealt with CSIR in reliance thereon, that a reasonable finder of fact could conclude conferred apparent authority upon CSIR.

17

authority." *Webber v. State Farm Mutual Auto. Insur. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001). In other words, ratification is defined as "confirmation after conduct." *Gay v. City of Somerville*, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994). However, "[b]efore ratification of an unauthorized transaction will be considered valid and binding, the principal must have full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction." *Webber*, 29 S.W.3d at 270 (citing *Gough v. Insur. Co. of N. Am.*, 157 Tenn. 546, 549–50, 11 S.W.2d 887, 888 (1928)) (internal quotations omitted).

Defendants Underwriters and I.U. have moved for summary judgment on this claim, averring that no reasonable trier of fact could conclude that either defendant acted with full knowledge of the material facts at the time of the alleged ratifying acts, since the undisputed evidence reveals that neither defendant knew that Star operated 500 trucks, as opposed to ten, upon acceptance of premium proceeds and issuance of the policies. While Star did file Responses in Opposition to defendants' Motions for Summary Judgment, Star twice declined to meet the defendants' arguments for dismissal of the ratification claim.

In the Sixth Circuit, issues that are not fully developed and argued are considered waived. *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995); *see also McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court . . . to put flesh on its bones.") (quotations and citations omitted), *and Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 607 (6th Cir. 1999) (finding, on appeal, that plaintiffs had waived state law claims in district court by failing to present any opposition to defendant's argument concerning the state law

18

claims). Because Star makes no mention of the ratification claim in any of its briefs to the court and has failed to present any argument or case law in support of the claim's survival, the court finds plaintiff's ratification claim abandoned and summary judgment as to this claim appropriate.[20]

Furthermore, even in the absence of waiver by the plaintiff, summary judgment would be appropriate on the merits. Star does not dispute that both I.U. and Underwriters were unaware, at the time of the alleged ratifying acts, that Star possessed 500 trucks as opposed to the ten reflected in the insurance application submitted to I.U. Based on this fact, no reasonable juror could conclude that defendants had the requisite "full knowledge of all material facts and circumstances relative to the unauthorized act," *Webber*, 29 S.W.3d at 270 (citing *Gough v. Insur. Co. of N. Am.*, 157 Tenn. 546, 549–50, 11 S.W.2d 887, 888 (1928)) (internal quotations omitted), for their acts to have been considered ratifying. "[I]n Tennessee, '[a] ratification occurs when the party, knowing all of the facts necessary to form an opinion, deliberately assents to be bound." *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 590 (6th Cir. 2000) (quoting *Yearby v. Shannon*, No. 03A01-9509-CV-00345, 1996 WL 87446, at *3 (Tenn. Ct. App. Feb. 29, 1996)). In the court's view, CSIR's representation to Star that 500 vehicles, as opposed to ten, would be covered by Underwriters' policy is most certainly a material fact of which Underwriters or I.U. would have had to have been aware before a finder of fact could reasonably conclude that the defendants deliberately assented to be bound by the unauthorized acts of CSIR.

---

[20]For the same reasons, the court finds that Star has abandoned its claims of negligent misrepresentation against defendants Underwriters and I.U. and will grant summary judgment on this basis.

**D.      Estoppel**

Star also contends that Underwriters and I.U., "having accepted premiums by or through

CSIR... and having cloaked CSIR with apparent authority...," should be estopped from asserting

lack of privity, forgery, misrepresentation, or fraud by CSIR as a defense against the relief

sought by Star.  In *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990),

the Tennessee Court of Appeals recited the requirements of a claim of equitable estoppel as

follows:

> The essential elements of an equitable estoppel as related to the party estopped
> are said to be (1) Conduct which amounts to a false representation or concealment
> of material facts, or, at least, which is calculated to convey the impression that the
> facts are otherwise than, and inconsistent with, those which the party
> subsequently attempts to assert; (2) Intention, or at least expectation that such
> conduct shall be acted upon by the other party; (3) Knowledge, actual or
> constructive of the real facts. As related to the party claiming the estoppel they
> are (1) Lack of knowledge and of the means of knowledge of the truth as to the
> facts in question; (2) Reliance upon the conduct of the party estopped; and (3)
> Action based thereon of such a character as to change his position prejudicially.

*Id*. at 825 (citing *Callahan v. Town of Middleton*, 292 S.W.2d 501 (Tenn. Ct. App. 1954)).

Estoppel is not favored, and it is the burden of the party seeking to invoke the doctrine to prove

each and every element thereof.  *Robinson v. Tennessee Farmers Mut. Insur. Co*., 857 S.W.2d

559, 563 (Tenn. Ct. App. 1993).

Citing hornbook law, Star maintains that, because CSIR wrote the insurance application

as Underwriters' agent, Underwriters is estopped from denying insurance coverage predicated on

a misrepresentation contained in the application– here, the number of trucks operated by Star.

However, the presumption upon which this argument rests– that CSIR acted under the apparent

authority of Underwriters when it perpetrated the insurance scam and defrauded Star– is false.

20

As previously discussed, no agency relationship existed between Underwriters and CSIR, and CSIR had neither actual or apparent authority to act on behalf of Underwriters in its dealings with Star. The doctrine of estoppel may not, therefore, be asserted on this basis.

Star next argues that defendants may not escape application of the general rule of estoppel, because they have breached their duty of good faith and due diligence to plaintiff. In particular, Star contends that, had I.U. and Underwriters wished to escape responsibility for the fraudulent cargo policy delivered to Star by CSIR, they had a duty to notify Star of the full extent of the fraud upon its discovery. (Docket No. 81 pp. 20–21; Docket No. 69 pp. 18–19) It is undisputed that, at least by early September of 2002, I.U. had learned through an auditor at Underwriters that there existed multiple policies issued by CSIR with I.U.'s name on them for excess policies and hundreds of thousands of premiums, and, on September 2, 2002, Underwriters first became aware of the discrepancies involving Star. Thereafter, on September 9, 2002, a Notice of Cancellation for the cargo policy that Underwriters had issued to Star was sent by I.U. Though the Notice of Cancellation was based on the fact that Star's operation had in excess of 400 trucks, as opposed to only ten as identified in the application received by I.U. on behalf of Star, the Notice itself did not state the reason for the cancellation and provided that coverage would continue until October 7, 2002. The deposition testimony of Anthony Sigwart, a representative of Underwriters, reveals Underwriters' rationale in not providing notice to Star that they had coverage on only ten units:

> Q:    Why didn't you provide them with notice that they only had coverage on ten uits, when you knew that they had over 400?
>
> A:    We hadn't had any claims on them. We were cancelling a policy, and we passed the cancellation through the chain that we dealt with to Mr. Culley.

I'm going to say that it was possible we could have given them more
reasons, but we were just cancelling it.

(Docket No. 80–4 pp. 149–50)

Though Star, through Holland, began a search for replacement coverage immediately
after receipt of the Notice of Cancellation, Holland testified that, had the Notice not stated that
coverage for cargo existed until October 7, 2002, he "would probably have been more
concerned." To Holland, the Notice of Cancellation "was a little security to me that I had a
policy with Star Transportation's name and our DOT number, our identification posted with
[Underwriters] that I had coverage for cargo until October 7, 2002. It didn't say I had a
fraudulent policy that had only offered limited coverage. It said I had coverage for cargo until
October the 7th." (Document 78–2) Holland also claims that the September 16, 2002 discussion
he initiated with Culley of I.U., in which Culley informed him that no umbrella policy had been
written by Underwriters and that the cargo policy had been written based upon submission of an
application which showed Star operated only ten units, contributed to his belief that full
coverage would be maintained until October 7, 2002, as Culley did not tell him that
Underwriters would not provide coverage for any cargo loss occurring before the cancellation
date. *Id.* ¶ 20. Holland contends that, as a result of his discussion with Culley and his receipt of
the 30-day cancellation notice, he believed that Star had until October 7, 2002 to replace its
cargo insurance and, until that date, would retain full coverage from Underwriters in this regard.

Accordingly, Star alleges that Underwriters should be estopped from denying coverage
for the September 23, 2002 loss of the Dell load due to its concealment of material facts from
Star at the time it discovered the fraudulent actions of CSIR. While defendants have generally

22

moved for summary judgment as to Star's claim of estoppel, defendants have failed to meet this argument directly in any of their briefs. Moreover, summary judgment is inappropriate under these facts, as a reasonable trier of fact could conclude that the September 9, 2002 Notice of Cancellation issued by I.U. on Underwriters' behalf, was conduct amounting to a concealment of material facts, that Underwriters would expect the Notice to be relied upon by Star in timing its effort to obtain replacement coverage, and that Underwriters had knowledge of CSIR's fraudulent acts and the fact that full cargo coverage did not exist. With respect to the elements of estoppel related to Star, the testimony of Holland adequately establishes a material issue of fact as to Star's knowledge of CSIR's fraud and the fact that full coverage did not exist, its reliance on the Notice of Cancellation and subsequent conversation with Culley, and whether this reliance changed Star's position with respect to obtaining replacement coverage prejudicially.

**E.      Negligence**

Star has also alleged in its Complaint that the negligent acts and omissions of defendants Underwriters and I.U. proximately caused the losses sustained by Star. To succeed in an action for negligence, Star must establish each of the following familiar five elements: (1) duty of care; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) a loss or injury; (4) causation in fact; and (5) proximate, or legal, causation. *Staples v. CBL & Assocs., Inc*., 15 S.W.3d 83, 89 (Tenn. 2000). The initial element, the existence of a legal duty, is a question of law. *Id*., 15 S.W.3d at 89 (citing *Rice v. Sabir*, 979 S.W.2d. 305, 309 (Tenn. 1998)). If the court determines that the defendant owes no duty to the plaintiff, then the inquiry stops and the claim for negligence is foreclosed. *Roberts v. Robertson County Bd. of Educ*., 692

S.W.2d 863, 869 (Tenn. Ct. App. 1985)  If, however, the court finds that a duty exists, it

proceeds to examine whether the defendant's actions or failure to act breached this duty, and

whether these actions or inactions constitute both a cause in fact and proximate cause of the

plaintiff's injury or loss.  *Id.*

Cause in fact and proximate cause are two distinct elements, both of which must be

established, and the Tennessee Supreme Court has explained the difference between them as

follows:

> Cause in fact refers to the cause and effect relationship between the defendant's
> tortious conduct and the plaintiff's injury or loss.  Thus, cause in fact deals with
> the "but for" consequences of an act.  The defendant's conduct is a cause of the
> event if the event would not have occurred but for the conduct.  In contrast,
> proximate cause, or legal cause, concerns a determination of whether legal
> liability should be imposed where cause in fact has been established.

*White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998) (quoting *Snyder v. LTG Lufttechnische*

*GmbH*, 955 S.W.2d 252, 256 n.6 (Tenn. 1997) (citations omitted)).  Proximate causation,

however, is the "ultimate issue" in negligence cases.  *McClenahan v. Cooley*, 806 S.W.2d 767,

774 (Tenn. 1991) (citing *Lancaster v. Montesi*, 390 S.W.2d 217, 220 (1965).  The Court has

established a three-pronged test for proximate causation:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing
> about the harm being complained of; (2) there is no rule or policy that should
> relieve the wrongdoer from liability because of the manner in which the
> negligence has resulted in the harm; and (3) the harm giving rise to the action
> could have reasonably been foreseen or anticipated by a person of ordinary
> intelligence and prudence.

*McClenahan*, 390 S.W.2d at 775.  "[P]roximate causation is a jury question unless the

uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable

persons must agree on the proper outcome." *Id.*

Star asserts that Underwriters, as insurer, and I.U., as insurer's agent, owed a duty of good faith and due diligence to Star, as the insured, and that Underwriters' and I.U.'s conduct in (1) failing to establish security procedures for the qualification of retail agents, (2) establishing a marketing scheme without accountability, (3) accepting applications without verification, and (4) failing to notify Star of a possible policy defect upon discovery of the fraud of CSIR fell below the applicable standard of care amounting to a breach of that duty. In addition, Star contends that defendants were negligent in failing to ensure compliance with the Tennessee Surplus Lines Act and in allowing the delivery of the motor cargo policy through an unlicenced agent.[21]

In Tennessee, an insurer has a duty to deal with its insured "fairly and in good faith." *MFA Mutual Insur. Co. v. Flint*, 574 S.W.2d 718, (Tenn. 1978); *see also Brown v. St. Paul Fire and Marine Insur. Co*., 604 S.W.2d 863, 865(Tenn. Ct. App. 1980). In particular, "the insurer's duty is to 'exercis[e] good faith and diligence in protecting the interest of its insured' which is 'to indemnify the insured against loss.'" 604 S.W.2d at 865 (quoting *Southern Fire & Casualty Co. v. Norris*, 250 S.W.2d 785, 790 (Tenn. Ct. App. 1952)). In *Southern Fire*, the Tennessee Court of Appeals explained that "[t]his duty arises not so much under the terms of the contract but it is said to arise because of the contract and to flow from it." 250 S.W.2d at 790; *see also Brown*, 604 S.W.2d at 865 (quoting *Southern Fire*). "This duty does not, however, extend to the

_____

[21]The Tennessee Surplus Lines Act places certain restrictions and requirements on insurers who place surplus lines insurance coverage in the state of Tennessee. *See, e.g.*, Tenn. Code Ann. § 56-14-103(a) ("If insurance coverages of subject resident, located or to be performed in this state, cannot be procured from licensed insurers after diligent effort, such coverages, hereinafter designated as surplus lines insurance, may be procured from unauthorized insurers, subject to the following conditions...."). Underwriters does not dispute that it was responsible for complying with this act in the case at bar.

25

insured's interests that do not arise from the contract." *Brown*, 604 S.W.2d at 865.

In *Brown*, an insurance adjustor, who had previously been warned by his employer that he would be terminated if he had another at-fault accident in a company car, sued the liability insurer of the company car on the grounds that its negligence and bad faith in investigating his subsequent accident in a company car (for which the adjustor claimed he was not at fault) and decision to make payment to a third-party claimant caused him to lose his job. The Court, however, concluded that the adjustor had no cause of action for negligence against the insurer, because the insurer's duty to use good faith in its dealings with the plaintiff as the insured did not extend to interests, like the loss of a job, that did not arise from the insurance contract. In the absence of such a duty, defendant's conduct could not be deemed the proximate cause of the loss.

The first three actions and omissions upon which Star relies to establish breach of the insured's duty of good faith and diligence concern Star's (and other insureds') general interest to be free from the fraudulent misrepresentations and actions of an "unscrupulous" third-party and cannot be said to arise or flow from the existence of the insurance contract itself. Thus, as in *Brown*, the insured's duty does not extend to the first three interests alleged, and the related conduct of the defendants cannot qualify as the proximate cause of the loss.

However, Underwriters' duty of good faith and diligence in protecting the interest of its insured does extend to Star's interest in retaining valid, non-fraudulent insurance coverage under its insurance contract for the duration of the agreement. As a result, Star's fourth basis for its negligence claim, defendants' failure to notify Star of a possible policy defect upon discovery of CSIR's fraud, is worthy of further attention. Particularly, the court must consider whether there

is sufficient evidence of breach, loss, causation in fact, and proximate causation, to survive summary judgment. Defendants do not meet this particular claim for negligence directly and do not argue the absence of genuine issues of fact as to these essential elements of negligence. Because defendants have not met their burden of proving the absence of a genuine issue of material fact as to the elements of this claim, summary judgment would be inappropriate on this claim of negligence.

Though summary judgment will be denied as to whether defendants were negligent in failing to notify Star of possible policy defects upon discovery of the fraudulent acts of CSIR, summary judgment is appropriate as to the claim that defendants were negligent in not ensuring compliance with the Tennessee Surplus Lines Act. Assuming the existence of the first three elements of this negligence claim, the court finds that no reasonable trier of fact could conclude that there is sufficient evidence of causation. Star has alleged that, but for defendants' use of an unlicenced agent for delivery of the motor cargo policy and failure to ensure compliance with the Surplus Lines Act, CSIR's fraud would have been discovered at the time that the application was presented. However, Star does not direct the court to any evidence upon which a reasonable finder of fact could rely to so find. And, taking the evidence available in the light most favorable to the plaintiff and affording all reasonable inferences to the plaintiff, the court also does not see how ensuring involvement of a licensed surplus agent in the transaction at issue would have unveiled CSIR's scheme to defraud plaintiff. Quite simply, there is no evidence of any relationship between the allegedly tortious conduct and the loss suffered by Star. For this reason, Star's theory of negligence based on a failure to ensure compliance with the Tennessee Surplus Lines Act cannot survive.

**F.     Comparative Negligence of Star**

I.U. argues that, even if it were found negligent, Star, through its own negligence, is 50 percent, or more, at fault for its losses and is, therefore, barred from recovery under Tennessee's law of comparative fault.  With respect to this doctrine and its relationship to summary judgment, the Tennessee Court of Appeals has recently explained:

> Generally, once it is shown that the plaintiff as well as the defendant(s) were negligent, the allocation of fault for the injuries among the negligent parties is a question of fact... A number of relevant factors are to be considered in comparing negligent conduct:
>
> The percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.
>
> This question is generally one left to the factfinder after trial, and as this court said in *LaRue v. 1817 Lake, Inc.,* 966 S .W.2d 423, 427 (Tenn.Ct.App. (1997), "[c]omparative fault is a question of fact within the jury's province, which should not be lightly invaded by the trial court."

*Ayrhart v. Scruggs*, No. M2003-00453-COA-R9-CV, 2004 WL  2113064 at *9–10 (Tenn. Ct. App. Sept. 21, 2004) (internal citations omitted).  Summary judgment based on the comparative negligence of the plaintiff may be appropriate "only if, after considering the evidence in the light most favorable to the plaintiff and affording all favorable inferences to the plaintiff, reasonable minds could not differ as to that conclusion."  *Id*. at 10.

  "In negligence cases, only after the element of duty is established, does the comparative

28

fault of the plaintiff come into play." *Staple v. CBL & Associates, Inc.*, 15 S.W.3d 83, 91 (Tenn. 2000). Here, the court has dismissed all of Star's theories of breached duty, save one– that Underwriters and I.U. were negligent in failing to properly notify Star of the fraud of CSIR upon its discovery and that this negligence prevented Star from obtaining replacement coverage prior to the September 22, 2002 theft of the Dell computers. According to I.U., however, regardless of I.U.'s negligence in this regard, Holland of Star should have been placed on notice, as a reasonably prudent person, of potential problems with CSIR based upon the conduct of CSIR long before the cargo loss sustained by Star for which it seeks recovery in this matter. I.U. asserts that Star's difficulty in obtaining its policies and the fact that the policies did not contain the right provisions should have called into question the integrity of CSIR and the validity of Star's insurance long before the loss. I.U. further asserts that Star's failure to take reasonable steps to replace its coverage or to get to the bottom of any concerns it had about whether its coverage existed prior to the September 22, 2002 loss was the sole and proximate cause of its loss and, if not the sole and proximate cause, at least 50 percent or more the cause of the loss.

However, Star has presented evidence that, had I.U., on behalf of Underwriters, not issued the Notice of Cancellation, which stated that coverage for cargo existed until October 7, 2002, Holland would have been more concerned with trying to find replacement coverage. To Holland, the Notice of Cancellation "was a little security to me that I had a policy with Star Transportation's name and our DOT number, our identification posted with [Underwriters] that I had coverage for cargo until October 7, 2002. It didn't say I had a fraudulent policy that had only offered limited coverage. It said I had coverage for cargo until October the 7th." (Document 78–2) Holland also claims that the September 16, 2002 discussion he initiated with Culley of

29

I.U., in which Culley informed him that no umbrella policy had been written by Underwriters and that the cargo policy had been written based upon submission of an application which showed Star operated only ten units, contributed to his belief that full coverage would be maintained until October 7, 2002, as Culley did not tell him that Underwriters would not provide coverage for any cargo loss occurring before the cancellation date. *Id.* ¶ 20. Holland contends that, as a result of his discussion with Culley and his receipt of the 30-day cancellation notice, he believed that Star had until October 7, 2002 to replace its cargo insurance and, until that date, would retain full coverage from Underwriters in this regard. Construing these facts and all reasonable inferences to be drawn therefrom in favor of Star, as it must, the court finds that Star was not, as a matter of law, more than 50 percent negligent for not having cargo insurance to cover the September 22, 2002 loss of the Dell computers. Disposal of this issue on summary judgment is, therefore, inappropriate.

G.      **Liability of INS.COM**

Assuming the role of third-party plaintiff, defendant I.U. brings a claim against INS.COM, asserting that, should I.U. be found liable to Star for failure to comply with Tennessee's Surplus Lines Insurance Act, Tenn. Code Ann. § 56-14-101, *et seq.*, it is entitled to indemnification from INS.COM. (Docket No. 14) According to I.U., INS.COM's breach of its Brokerage Agreement with I.U. and coinciding failure to comply with the Surplus Lines Act were the proximate causes of any loss to Star and, since I.U. was entitled to rely on the terms of the Brokerage Agreement, it is entitled to indemnification from INS.COM.

By its own terms, I.U.'s third-party claim is applicable only if I.U. is adjudged liable to Star for failure to comply with the Tennessee Surplus Lines Insurance Act. Because Star has

explicitly stated that it does not assert any independent claim or cause of action against I.U. for violating the Act (Docket No. 75 p. 6), and because the court has declared that no negligence action exists for such a failure in the case at bar, I.U.'s Motion for Summary Judgment regarding its third-party claim will be denied as moot and INS.COM's Motion for Summary Judgment concerning its liability in this matter will be granted.

## III. CONCLUSION

For these reasons, the Motions for Summary Judgment filed by defendants Underwriters and I.U. against plaintiff Star will be granted in part and denied in part. Additionally, I.U.'s Motion for Summary Judgment regarding its third-party claim will be denied as moot, and the Motion for Summary Judgment filed by INS.COM will be granted.

An appropriate order will issue.

ALETA A. TRAUGER

United States District Judge